UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

RICHARD BLOME,

        Plaintiff,

v.                             Case No. 3:11-cv-1000-J-34PDB

SAMUEL GENTILE,

        Defendant.

_____

**ORDER**

**I. Status**

Plaintiff Richard Blome, an inmate of the Florida penal system who is proceeding in forma pauperis, initiated this action on October 11, 2011, by filing a pro se Civil Rights Complaint (Doc. 1) under 42 U.S.C. § 1983. Blome filed an Amended Complaint (Doc. 5) on October 20, 2011; a Second Amended Complaint (Doc. 9) on November 25, 2011; and a Third Amended Complaint (Doc. 26) on July 13, 2012. In the Third Amended Complaint, Blome names Samuel Gentile, who was a sergeant at New River East Correctional Institution (NRCI), at the time of the alleged incident. He asserts that Sergeant Gentile violated his Eighth Amendment right to be free from cruel and unusual punishment when he used unnecessary and excessive force on January 8, 2010. As relief, Blome seeks compensatory, punitive and nominal damages.

This cause is before the Court on Defendant Gentile's Motion for Summary Judgment (Motion) (Doc. 51).[1] The Court advised Plaintiff of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion to dismiss or a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and gave him an opportunity to respond to the Motion. See Order (Doc. 12); Summary Judgment Notice (Doc. 52). Plaintiff did so, see Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Response) (Doc. 55), and the Defendant's Motion is ripe for judicial review.

## II.  Plaintiff's Allegations

In his verified Third Amended Complaint,[2] Blome alleges the following pertinent facts to support his excessive use of force claim.

> On 01.08.2010 while already housed in a protective custody cell at New River East C.I. because of previous threats from guards[,] Samuel Gentile then handcuffed and took this Plaintiff from that cell and punched the head

---

[1] The Court will refer to the exhibits appended to Defendant's Motion as Def. Ex.

[2] See Stallworth v. Tyson, No. 13-11402, 2014 WL 4215438, at *2 (11th Cir. Aug. 27, 2014) (citations omitted) ("The factual assertions that [Plaintiff] made in his amended complaint should have been given the same weight as an affidavit, because [Plaintiff] verified his complaint with an unsworn written declaration, made under penalty of perjury, and his complaint meets Rule 56's requirements for affidavits and sworn declarations.").

plus left shoulder area of the Plaintiff
without provocation or reason. The assault was
captured on surveillance cameras positioned
above us only 10 feet away. This act
permanently injured the left shoulder joint
area of the Plaintiff. This assault was
uncalled for, done sadistically from behind
the Plaintiff with no warning or expectation
of being attacked by the Defendant; who
maliciously meant to injure and cause pain.
The joint injury shall forever limit and
affect the employment of the Plaintiff as a
union crane operator. The Defendant acted evil
and intended to cause harm plus purposely
violated the Plaintiff's rights to be freely
safe or protected from violence by prison
guards. The threats and abuse was [sic]
repeatedly done. The Plaintiff suffered a
partially dislocated left shoulder. The
Defendant has shown "deliberate indifference"
to the rights of the Plaintiff but instead
used a physical beating as his form of
punishment on this Plaintiff as it was clearly
proven on 2 cameras that recorded everything.

Third Amended Complaint at 5-6.

### III. Summary Judgment Standard

The Eleventh Circuit recently set forth the summary judgment

standard.

Summary judgment is proper when "there is no
genuine dispute as to any material fact and
the movant is entitled to judgment as a matter
of law." Fed.R.Civ.P. 56(a). The substantive
law controls which facts are material and
which are irrelevant. Raney v. Vinson Guard
Service, Inc., 120 F.3d 1192, 1196 (11th Cir.
1997). Typically, the nonmoving party may not
rest upon only the allegations of his
pleadings, but must set forth specific facts
showing there is a genuine issue for trial.
Eberhardt v. Waters, 901 F.2d 1578, 1580 (11th
Cir. 1990). A pro se plaintiff's complaint,
however, if verified under 28 U.S.C. § 1746,
is equivalent to an affidavit, and thus may be

3

viewed as evidence. See Murrell v. Bennett, 615 F.2d 306, 310 n.5 (5th Cir. 1980). Nevertheless, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge." Fed.R.Civ.P. 56(c)(4). "[A]ffidavits based, in part, upon information and belief, rather than personal knowledge, are insufficient to withstand a motion for summary judgment." Ellis v. England, 432 F.3d 1321, 1327 (11th Cir. 2005).

As we've emphasized, "[w]hen the moving party has carried its burden under Rule 56[], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Unsupported, conclusory allegations that a plaintiff suffered a constitutionally cognizant injury are insufficient to withstand a motion for summary judgment. See Bennett v. Parker, 898 F.2d 1530, 1532-34 (11th Cir. 1990) (discounting inmate's claim as a conclusory allegation of serious injury that was unsupported by any physical evidence, medical records, or the corroborating testimony of witnesses). Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

Howard v. Memnon, Case No. 13-12049, 2014 WL 3411093, at *1-2 (11th Cir. July 15, 2014) (per curiam) (footnote omitted). In an action involving the alleged violation of plaintiff's federal constitutional rights under 42 U.S.C. § 1983, "assuming all facts in the light most favorable to [plaintiff, as the non-moving party]," summary judgment is properly entered in favor of the defendant where "no genuine issue of material fact exist[s] as to whether [plaintiff]'s constitutional rights were violated." McKinney v. Sheriff, 520 F. App'x 903, 905 (11th Cir. 2013) (per curiam).

## IV. Law and Conclusions

In his Motion, Defendant Gentile asserts that the Court should grant summary judgment in his favor and dismiss Blome's Third Amended Complaint as frivolous and malicious. He argues that: (1) Blome cannot show a violation of the Eighth Amendment; (2) Gentile is entitled to qualified immunity; (3) Blome cannot recover more than nominal damages; and (4) Blome's allegations in his Third Amended Complaint, his sworn testimony during his deposition, and statements made in his signed filings in the instant action are "pure fabrications that merit dismissal as frivolous and malicious." Motion at 1 (emphasis deleted). In support of his assertions, Gentile submitted the following exhibits: Def. Exs. A, Blome's Florida Department of Corrections (FDOC) Offender Network, Inmate Population Information Detail; B, Declaration of Samuel

Gentile (Gentile's Declaration),[3] dated January 21, 2014; B1, Blome's letter to Gentile, dated January 30, 2010; C, Declaration of Robert Schmidt (Schmidt's Declaration), dated January 21, 2014; D, Excerpts of Blome's Deposition, dated April 19, 2013; D1, diagram drawn by Blome and defense counsel Garland and approved by Blome; D2, Blome's post-use-of-force witness statement, dated January 8, 2010; D5, Blome's letter to Gentile; E, Clips 1 and 2 (sealed),[4] fixed wing videotape of G-dormitory, wing 3, dated January 8, 2010; F (sealed), videotape of Blome's post-use-of-force medical examination, as filmed with a hand-held video recorder operated by Mark Turgeon, dated January 8, 2010; G, Declaration of Nurse Geraldine Crawford (Crawford's Declaration), dated January 22, 2014; G1, post-use-of-force medical examination records, dated January 8, 2010; H, FDOC Chronological Record of Health Care. In responding to Gentile's Motion, Blome asserts that the surveillance film "is absolute proof that Defendant used excessive force on Plaintiff!" Response at 8. Blome also submitted an affidavit to support his assertions. Id. at 10, General Affidavit (Blome's Affidavit).

---

[3] See Defendant's Notice of Re-Filing Exhibit B of the Motion for Summary Judgment (Doc. 53), filed January 23, 2014.

[4] The Court granted Defendant's motion to file exhibits E and F under seal. See Order (Doc. 62), filed March 20, 2014, at 1, paragraph 2. The Court will cite to the two clips of Def. Ex. E as Clip 1 and Clip 2.

On January 8, 2010, Blome was housed at NRCI, G-dormitory, wing three, lower level and bunk, cell G3-112. Gentile's Declaration at 1; Schmidt's Declaration at 1; Blome's Deposition at 32;[5] D1 (diagram showing the location of Blome's cell). That morning, Gentile and Officer Robert Schmidt searched Blome's cell and confiscated two pictures of children, one eyeglasses case, and two pairs of reading glasses. Gentile's Declaration at 1; Blome's Deposition at 49-50. Later that morning, at approximately 10:53 a.m., Gentile and Schmidt went back to Blome's cell, restrained Blome in handcuffs behind his back, and escorted him to a nearby shower cell. Gentile's Declaration at 1; Blome's Deposition at 51 (admitting that he was handcuffed behind his back); Def. Ex. E, Clip 2. After securing Blome in a shower cell, Gentile and Schmidt conducted another search of Blome's cell to ensure that Blome did not have any weapons or contraband that he could bring with him during a forthcoming planned escort to see the assistant warden. Gentile's Declaration at 1-2; Def. Ex. E, Clip 2.

After searching Blome's cell, Gentile and Schmidt returned to the shower cell at 10:58 a.m. to escort Blome. Gentile's Declaration at 2; Def. Ex. E, Clip 2. With Blome restrained in handcuffs behind his back,[6] Gentile and Schmidt escorted him to

---

[5] The Court will cite to the original deposition transcript page numbers, not the CM/ECF page numbers.

[6] Blome asserts that he was handcuffed in front when Gentile and Schmidt escorted him for the interview with the assistant

meet with the assistant warden regarding a five-page letter that Blome had addressed to the warden about a planned riot. Gentile's Declaration at 2; Blome's Deposition at 92; Def. Ex. E, Clips 1 and 2. During the escort, Gentile asked Blome whether he had a property receipt for the items retrieved in the first cell search. Gentile's Declaration at 2. Upset that Gentile and Schmidt had confiscated pictures of his children, Blome's Deposition at 52, Blome responded, "They are mine" and "You're gonna give all that shit back to me." Gentile's Declaration at 2; Blome's Deposition at 52-55. Gentile again questioned Blome as to whether he had a property receipt for the items, to which Blome responded "They are mine and you're going to give them back to me and apologize for taking them." Gentile's Declaration at 2; Blome's Deposition at 57.

While waiting at the door exiting G-dormitory, wing three, Gentile informed Blome that the items were contraband, and that a property receipt would be issued to him. Gentile's Declaration at 2; Plaintiff's Deposition at 57. Standing in the doorway waiting for the control room deputies to release the lock, Blome repeatedly stated that Gentile was "gonna apologize" for taking his property, and was going to return his items. Blome's Deposition at 57. Both

---

warden. Blome's Deposition at 40-42, 78; Response at 3. Nevertheless, Blome agrees that the surveillance videotape is "absolute proof" of what transpired that morning. Response at 8. That videotape shows that Blome was handcuffed with his hands behind his back. Def. Ex. E, Clip 1.

Blome and Gentile agree that they discussed the confiscated items, while standing in the doorway.

Blome and Gentile also agree that Gentile used force upon Blome; however, they disagree as to how it happened and whether Gentile used force in a good-faith effort to maintain or restore discipline, or applied it maliciously and sadistically to cause harm. While Blome asserts that the attack began before the three men stepped through the confinement wing door, see Blome's Deposition at 53, 58, 61, 65, was without reason or provocation, see Blome's Affidavit, and was unnecessary and excessive, see Third Amended Complaint at 5, he also contends that the videotapes submitted by Defendant Gentile accurately show what transpired that morning. The fixed wing videotape shows Blome stopped in the doorway and turning around to talk to Gentile. Def. Ex. E, Clip 1. Blome admits that, at the time of this incident, he "was upset[,]" Blome's Deposition at 52, continued talking about the confiscated items, and repeatedly used derogatory and threatening language when he addressed Gentile. Id. at 53 ("And I was using the foul language and everything."); 52-57.

Gentile asserts that, when Blome heard Gentile's advice about the confiscated items, Blome "stopped and turned in an aggressive manner toward" Gentile. Gentile's Declaration at 2. Gentile took the following actions:

> I then grasped the hand restraints behind
> Blome's back with my left hand and placed my

> right hand on his right shoulder. I turned
> Blome away from me and pinned him firmly
> against the door to restrain him from any
> further aggressive behavior that could
> escalate the situation. Because Blome's legs
> were unrestrained, I pinned him against the
> door to restrict his ability to kick me, in
> order to protect myself from any potential
> harm. Blome began to shout, "Fuck you, you're
> going to give me back those pictures or I'll
> fuck you up, because they're mine!"

Id.; Def. Ex. E, Clip 1. Blome described what transpired just

before Gentile hit him.

> The control room deputy released the lock for
> the door to open and we can hear the lock
> sliding back and that's when Gentile said the
> motherfucker tried to head butt me. Tried to
> head butt me. Did you see that? And I guess
> the door was able was able [sic] to push open
> so that's when he hit me.
>
>         . . . .
>
> I was hit first from [sic] with his right hand
> and then what I felt was his left came
> chopping down like a sledgehammer.
>
>         . . . .
>
> [T]he blow to the shoulder caused me to go,
> propelled me though the door.

Blome's Deposition at 61, 62, 66-67; see Def. Ex. E, Clip 1.

Specifically, Blome explains that he was first hit two or three

times in the back of the head with Gentile's right hand followed by

a karate chop to his left shoulder with Gentile's left hand.

Blome's Deposition at 62-64, 66, 68. Blome insists that it was the

karate chop to the shoulder, not any blow to the head, that

propelled him through the confinement wing door. Id. at 65-68. He

states that Gentile's force "was fast" and lasted "[l]ess than five seconds." Id. at 64.

The videotape footage shows that, when the officer in the control room unlocked the door for the three men to exit wing three of G dormitory, Blome, Gentile, and Schmidt walked through the doorway and into the inner hall in front of the control room. Def. Ex. E, Clip 1; see Gentile's Declaration at 2; Schmidt's Declaration at 1; Def. Ex. D1 diagram; Blome's Deposition at 57-61, 66-67. According to Schmidt and Gentile, as they passed through the door, Blome turned toward Gentile in an aggressive manner and attempted to head butt Gentile. Gentile's Declaration at 2; Schmidt's Declaration at 1. Despite having prepared and submitted an affidavit in opposition to Defendant's Motion, and having testified that he heard Gentile say that he, Blome, "tried to head butt" Gentile, see Blome's Deposition at 57, 59, 61, 62, 74, Blome has not disputed, in any way, Gentile and Schmidt's sworn statements[7] that he, Blome, tried to head butt Gentile before the use of force. Gentile feared that Blome would hurt him if he did not use force to protect himself. Gentile's Declaration at 2.

Gentile described the type of force he used to protect himself.

> I forced Blome against the wall on our left
> side and down to the floor. I placed Blome in

---

[7] See Gentile's Declaration at 2, paragraph 7, and Schmidt's Declaration at 1, paragraph 3

> a seated position against the wall and held
> him there until he calmed down. Blome then
> ceased his aggressive behavior and I released
> my hold on him. No further force was used. I
> then ordered Blome to stand up and he
> complied. I notified the shift supervisor of
> this incident and vacated the area pursuant to
> FDOC policy.

Id. Schmidt stated that he observed Gentile "force Blome to the ground using the minimum amount of force necessary in order to protect himself." Schmidt's Declaration at 1. Schmidt continued the direct supervision of Blome until additional staff responded. Id. Lieutenant Steve Tricocci and Sergeant John Proctor reported to the scene and escorted Blome to a post-use-of-force medical examination. Id. Pursuant to FDOC policy, Schmidt left the scene. Id. According to Gentile and Schmidt, Gentile neither reset Blome's alleged dislocated shoulder, provided Blome with medical treatment, nor instructed Blome as to how to reset a dislocated shoulder. Gentile's Declaration at 3; Schmidt's Declaration at 1. Neither Schmidt nor Gentile observed any injuries suffered by Blome as a result of Gentile's use of force. Id.

Approximately 11:10 a.m., within ten minutes of the incident, Sergeant Mark Turgeon began videotaping with a hand-held camera. See Def. Ex. F. Nurse Hicks, Nurse Crawford, Tricocci, and Blome entered the medical station for Blome's post-use-of-force medical examination. Def. Ex. F; Crawford's Declaration at 1. After verifying that the hand-held camera had audio, Blome complained about injuries to his head and mid-to-lower back resulting from

Gentile's use of force. Id. Responding to Blome's complaints of pain, the nurses checked the back of Blome's head for injuries multiple times, and lifted the back of his shirt to inspect his back for injuries. Id. When Nurse Crawford wrapped a blood pressure cuff around Blome's left arm to take his vital statistics, Blome did not cry out or otherwise indicate that he was in pain as a result of this action or any other action taken during the medical examination. Crawford's Declaration at 1-2; Def. Ex. F. During the medical examination, Nurse Crawford neither identified any injuries to Blome's head or back nor observed any physical injuries anywhere else on Blome's  body. Crawford's Declaration at 1; Def. Ex. G1, Diagram of Injury (stating "[n]o injury identified" at 11:12 a.m.). According to Crawford, she neither reset Blome's alleged dislocated shoulder nor saw anyone else reset a dislocated shoulder. Crawford's Declaration at 2. Crawford did not provide any medical treatment at that time since there were no discernible injuries. Id. Nevertheless, she instructed Blome that he could access sick call if needed. Id.

On January 30, 2010, Blome sent Gentile a letter that was addressed to "Gentile and then Capt. Norman." Gentile's Declaration at 3; Def. Ex. B1. In the letter, Blome described, in pertinent part, what transpired that morning.

> To be real w/ ya, I do practice aikido;
> it's a nice Chinese martial arts that Steven
> Segal does on TV and in movies. It's not just
> about using peoples' own momentum against 'em

13

to then break their joints or whatever, but the fighting technic [sic] also teaches ya how to control your own emotions as well. I've taught it to some Broward sheriff office female cops as a defense to use on the street.

On that day of 1-8-10 I quickly realized that you got little control over your own feelings; that ya let anger override your better judgment. That's why I pushed your buttons over my photos and eyeglasses. I stayed in front [of] you and only talked shit; I knew by your breathing that ya were about to do something, so I waited patiently and kept running my mouth. I didn't need to do more cuz you did it all for me when the door opened and ya pushed me out into the hallway. I seen it all coming. Why do ya think I instantly slid down against the wall? **You merely glanced a blow off my left ear; your watch struck my left shoulder but I wasn't hurt at all.** I stayed on the ground cause I was gonna kick out your left knee cap where ya had all your 240 lbs. of weight on. **But I didn't need to cuz ya quit touching me after I was down.** If I had pop[p]ed your knee, you know officer Schmidt probably would've ran away to spray me w/ mace. He's no fighter. Tell him to man up. Ya need someone who'll back you up instead [of] just lying for ya also on your DR.

Def. Ex. B1 at 1 (emphasis added).

Blome conceded that he wrote the letter to Gentile, <u>see</u> Blome's Deposition at 119-20, but confessed that the "whole letter is fictitious." <u>Id</u>. at 123. He offered several reasons for writing the "fictitious" letter:

I lied and said that I practiced the aikido because I was trying to get [Gentile] to be afraid of me or treat me differently with respect or - or think twice about trying to assault me again. I think I wrote it 'cause I was trying to get him to admit that he lied about me trying to head butt him.

14

. . . .

I think I wrote that because I knew he was gonna show it to other people and he didn't want me to admit that. He didn't want me to claim any injury and I think I wrote that to show that I was adhering to his instructions and I never didn't say nothing to nobody which I didn't and I was trying to get his cooperation to come clean about the falsely written DR 'cause - 'cause the DR he wrote on me is a CM DR, close management DR and he charged me with aggravated battery, aggravated assault on a staff. But all along he wanted me to keep my mouth shut about him hurting me and I knew that if I wrote this letter, he would show it to other people.

. . . .

Because I told him that I did aikido even though I never did. I told him that I did because I said that while I was down on the ground, I could have kicked out his knees, not that I planned to. But I think even - even in the writing I said that I could have planned. I could have planned to kick out his knees if I wanted to, but I didn't. So I think I was just trying to get him to feel - feel as if he should think twice about assaulting me again. But all along I knew this letter would get shown to Captain Norman and him so that's why I wrote it to Captain Norman and him to show him, yeah, okay. You want me to keep my mouth shut, I'll keep my mouth shut. . . .

. . . .

I just wrote - that whole letter is fictitious. The letter is fictitious, but I just wrote it, as I said, 'cause [Gentile] wanted me to keep his name clean and I did.

Id. at 121-22, 123.

In February 2011, more than a year after the January 8, 2010 incident, Blome visited the medical clinic and requested a front

handcuffing pass so that any hand restraints would be applied in front of him instead of behind his back. Def. Ex. H at 1-3. During those visits, Blome complained of left shoulder injuries and dislocations that he suffered in 1991 in the Marine Corps, during an undisclosed incident in 1994, and an incident at the end of 2010 in the county jail while he was practicing martial arts. Id. at 1-2. The medical staff observed that Blome was "able to easily remove [his] blue shirt and undershirt freely without grimace, hesitation or any obvious limittaions [sic] in a fluid movement." Id. at 2. The staff also observed that Blome was "able to push up from laying [sic] on bunk without diff[iculty] or grimace" and was able to "lean[] on cell door with . . . arms raised above head without diff[iculty] or grimace." Id. at 1. As a result of the aforementioned observations, their examination, and his medical records, the medical staff found that Blome did not meet the criteria for a front cuff pass, and therefore denied his request. Id. at 3.

On February 14, 2011, Blome refused to have an x-ray of his shoulder. Id. In mid-July 2012, nine months after initiating this action and within several days of filing his Third Amended Complaint,[8] Blome, for the first time, went to the medical clinic, complaining about left shoulder pain allegedly resulting from the

---

[8] Blome filed the Third Amended Complaint on July 3, 2012, pursuant to the mailbox rule.

incident at issue. Def. Ex. H at 4-7. On July 17, 2012, a medical technician noted that Blome "fully extended [his] arm above [his] head while removing [his] t-shirt then refused to raise [it] when asked to show ROM [(range of movement)]." Id. at 5.

The Eleventh Circuit has set forth the standard in an excessive use of force case.

> [O]ur core inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992). In determining whether force was applied maliciously and sadistically, we look to five factors: "(1) the extent of injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates[, as reasonably perceived by the responsible officials on the basis of facts known to them]..." Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999) (quotations omitted).[9] However, "[t]he Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 112 S.Ct. at 1000 (quotations omitted).

McKinney, 520 F. App'x at 905; Howard, 2014 WL 3411093, at *2 ("Courts examine the facts as reasonably perceived by the

---

[9] See Whitley v. Albers, 475 U.S. 312, 321 (1986).

17

defendants on the basis of the facts known to them at the time.") (citation omitted).

As an initial matter in the instant action, even taking Blome's allegations as true, the amount of force at issue here was de minimis. As noted by the Supreme Court, not "every malevolent touch by a prison guard gives rise to a federal cause of action. See Johnson v. Glick,[10] 481 F.2d, at 1033 ('Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights')." Hudson v. McMillian, 503 U.S. 1, 9 (1992). Although no force was necessary according to Blome's version of the events, the force allegedly used by the Defendant Gentile (hitting Blome one to three times, and karate chopping his left shoulder once with no discernible physical injury) "is not of a sort repugnant to the conscience of mankind." Id.

Moreover, this Court finds that Defendant Gentile has met his initial burden of showing, by reference to the declarations, Blome's medical records, and surveillance videotapes, that there are no genuine issues of material fact that should be decided at trial. Blome asserts that the surveillance videotapes support his version of the incident and are "absolute proof" that Gentile used excessive force. Response at 8; Blome's Deposition at 142. However, the fixed wing surveillance videotape, see Def. Ex. E, neither

---

[10] Johnson v. Glick, 481 F.2d 1028 (2nd Cir. 1973).

supports Blome's version of the incident, nor suggests that Gentile's force was excessive, or that he applied it maliciously and sadistically to cause harm.

A review of the video footage shows Blome, handcuffed behind his back, being escorted by Gentile and Schmidt. The video shows the three men standing at the confinement wing door waiting for it to open, and then stepping through the door. Contrary to Blome's assertions, see Blome's Deposition at 65-68, there is no evidence on the video of Gentile striking or punching Blome three, two, or even one time before the trio steps through the door. Nor is there any evidence of Gentile raising either arm or hand to hit or karate chop Blome as the door is opening, and thus, propelling him through the door. Rather, the video is consistent with Gentile's declaration, in which he states that, as he waited for the door to open, he "grasped" Blome's restraints behind Blome's back with his left hand and "placed" his right hand on Blome's shoulder. Gentile's Declaration at 2, paragraph 6. The video confirms that Gentile's hands remained in such positions as the three men walk through the confinement wing door. Also consistent with the declarations of both Gentile and Schmidt, the video shows that, after passing through the confinement wing door, a brief scuffle ensues. While the camera angle does not permit a view of what precisely occurred, it confirms that within five seconds of beginning, the incident was over, and Blome was on his feet

proceeding towards the nurse's station. Contrary to Blome's contention that the video will confirm his description of the incident, it is actually consistent with that of Gentile and Schmidt. <u>See</u> Gentile's Declaration at 2, paragraphs 6-8; Schmidt's Declaration at 1, paragraph 3.

Additionally, Defendants have presented evidence that, even though Blome complained of head and back pain immediately after the incident, the nurses found no physical injuries resulting from the use of force. The post-use-of-force videotape of the medical examination shows the nurses responding to Blome's complaints and repeatedly inspecting Blome's back and head areas. Thus, Defendant Gentile has shown that Blome did not suffer any detectable physical injury, which further supports a finding that any use of force was <u>de minimis</u>.

Because Defendant Gentile has met this initial burden, Blome is required to present his own documentation (affidavits, depositions, answers to interrogatories, admissions on file, etc.) to show that there is a genuine issue for trial. Blome has failed to present this Court with any evidence, other than his own affidavit, to show that he received any injuries during the alleged use of force or that the alleged use of force was more than <u>de minimis</u>. In his January 31, 2014 affidavit opposing summary judgment, Blome avers:

> On or about January 10, 2010[11] I was then
> assaulted w/o reason or provocation by
> Sergeant Samuel Gentile while he was escorting
> me to an interview with the assistant warden.
> During that assault my left shoulder became
> partially dislocated; it needed to be popped
> back into the joint area. This was done
> quickly within the 10 minutes it took before
> other prison staff came.[12] Afterwards I
> feared reprisal and retaliation so I didn't
> claim the shoulder injury. I continued to deny
> that I was hurt. I never purposely tried to
> deceive this court where I filed a civil
> complaint; nor shall I ever manipulate or be
> intentionally dishonest with this court.

Blome's Affidavit (Doc. 55).

The Supreme Court has cautioned that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). In Scott, the Supreme Court had the benefit of reviewing a videotape of the incident at issue, id. at 378-80, and as such, found that the Court of Appeals "should have viewed the facts in the light depicted by the videotape." Id. at 381; see

---

[11] The parties agree that the incident occurred on January 8, 2010.

[12] Initially, Blome asserted that, immediately after the incident, a nurse reset the dislocation of his shoulder. See Motion to Compel Products of Listed Documents (Doc. 32), filed November 19, 2012, at 2, paragraph E. However, at his April 19, 2013 deposition, Blome described a different scenario in which Gentile showed him how to pop it back in place, see Blome's Deposition at 125-128; he admitted that he had made "a mistake," but never intended "to mislead the court." Id. at 128.

_Mathis v. Adams_, No. 14-10605, 2014 WL 4067751, at *2 (11th Cir. Aug. 19, 2014) (per curiam) (citation omitted) ("In light of the uncontroverted video evidence, the district court was required to view the facts in the light depicted by the video even if [Plaintiff's] allegations contradicted its depiction.")

Here, Defendant Gentile filed video recordings, see Def. Ex. E, which captured the event in question, and Plaintiff agrees that the video footage accurately reflects the event as it transpired, see Response at 6-8. Accordingly, in ruling on summary judgment, the Court views the facts and all reasonable inferences in the light most favorable to Plaintiff except "to the extent [Plaintiff's] version of the facts is clearly contradicted by the [video], such that no reasonable jury could believe it." _Beshers v. Harrison_, 495 F.3d 1260, 1262 n.1 (11th Cir. 2007) (alterations added); see _Mathis_, 2014 WL 4067751, at *2 (stating "the district court could not credit [Plaintiff's] allegation that the defendants beat him for thirty minutes, as that allegation was 'blatantly contradicted by the record [(video)], so that no reasonabl[e] jury could believe it[]'").

As to those facts affirmatively contradicted by the video, the Court relies on the video and will not adopt Plaintiff's factual allegations. See _Bodden v. Bodden_, 510 F. App'x 850, 852 n.2 (11th Cir. 2013) (per curiam) ("We need not adopt [Plaintiff's] version of the facts to the extent it is clearly contradicted by a

videotape such that no reasonable jury could believe it."); <u>Sims v. Quilliams</u>, 378 F. App'x 945, 946 (11th Cir. 2010) (per curiam) ("Because the district court relied on the facts as it observed them in the tapes, it did not err by relying on these facts rather than on [the plaintiff's] contradictory assertions."); <u>White v. Georgia</u>, 380 F. App'x 796, 797 (11th Cir. 2010) (per curiam) ("It is settled law that where the record tells two different stories, one blatantly contradicted by the evidence, the court is not required to adopt that version of the facts when ruling on summary judgment."). Blome's description of the use of force incident is refuted by the video, which shows Gentile's hands remaining in place as the trio awaits the opening of the door and as they pass through the door. Indeed, contrary to Blome's assertions, there is no indication of Gentile raising either hand, hitting or karate chopping Blome before passing through the door or even as they pass through the door. Rather, the video is consistent with the descriptions of the incident given by both Gentile and Schmidt. Thus, the Court relies on the video, and not Blome's description of how the use of force incident transpired.

Nevertheless, the parties agree that a use of force did occur. Upon review, the Court finds that Gentile's force was applied in a good-faith effort to maintain or restore discipline in a situation where Blome was admittedly upset and acting in a threatening manner

towards Gentile.[13] Gentile's response was brief and "no more than a de minimis use of force," Smith v. Sec'y, Dep't of Corr., 525 F. App'x 511, 513 (11th Cir. 2013) (per curiam), that was over in less than five seconds, see Blome's Deposition at 64; Motion (Doc. 51) at 12. Indeed, the video reflects that no more than five seconds elapsed between when the three men pass through the door and when they can be seen with Blome upright and walking towards the nurse's station. The type of force used by Gentile was "not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 10 (quotation marks omitted); Smith, 525 F. App'x at 514 (stating that the type of force allegedly used by defendant (twisting plaintiff's arm and pressing him against the wall) was "not of a sort repugnant to the conscience of mankind," but instead was similar to the push or shove described in Wilkins,[14] which "almost certainly fails to state a valid excessive force claim[]") (citations and quotations marks omitted); Motion at 13.

Additionally, efforts were made to temper the effect of the use of force. See Ledlow v. Givens, 500 F.App'x 910, 913 (11th Cir. 2012) (per curiam), cert. denied, 133 S.Ct. 2802 (2013); Fennell v. Gilstrap, 559 F.3d 1212, 1220 (11th Cir. 2009) (per curiam) ("The immediate offer of medical assistance demonstrates an effort to

---

[13] Notably, Blome has not disputed Gentile's statement that Blome tried to head butt Gentile.

[14] Wilkins v. Gaddy, 559 U.S. 34, 38 (2010).

24

temper the severity of the response."). This factor permits the court to take into account efforts by the officers to mitigate the effects of the force that was applied. As soon as Gentile "calmed down" Blome, Gentile's Declaration at 2, he notified the shift supervisor of the incident, which resulted in obtaining immediate medical assistance for Blome. Gentile's response "makes it less likely that [he] was acting sadistically instead of in good faith." Cockrell v. Sparks, 510 F.3d 1307, 1310 (11th Cir. 2007). Within no more than twelve minutes of the incident, two nurses examined Blome, checked his vital signs, and inspected his head and middle/lower back (the areas he complained about as a result of the incident). See Def. Exs. F; G at 1, FDOC Emergency Room Record.

Additionally, the United States Supreme Court held that the extent of the injury is a factor that may provide some evidence of the amount of force applied and whether the use of force was necessary under the specified circumstances.

> This is not to say that the "absence of serious injury" is irrelevant to the Eighth Amendment inquiry. Id. at 7, 112 S.Ct. 995.[15] "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." Ibid.(quoting Whitley, 475 U.S. at 321, 106 S.Ct. 1078).[16] The extent of injury may also provide some indication of the amount of force applied. . . .

---

[15] Hudson v. McMillian, 503 U.S. 1 (1992).

[16] Whitley v. Albers, 475 U.S. 312 (1986).

> Injury and force, however, are only
> imperfectly correlated, and it is the latter
> that ultimately counts. . . .

Wilkins v. Gaddy, 559 U.S. 34, 37-38 (2010). A court ultimately

should decide an excessive force claim based on the nature of the

force rather than the extent of the injury. Id. at 38. Here, "there

was a lack of serious injury." Smith, 524 F. App'x at 513. The fact

that Gentile applied only de minimis force is evidenced by the fact

that Blome suffered no detectable physical injury as a result of

the force.

To the extent that Blome asserts that he suffered severe

injury to his left shoulder as a result of the incident, "[S]elf-

serving statements by a plaintiff do not create a question of fact

in the face of contradictory, contemporaneously created medical

records." Whitehead v. Burnside, 403 F. App'x 401, 403 (11th Cir.

2010) (citation omitted); Smith, 524 F. App'x at 513-14 (holding

that a prisoner plaintiff's claims of a fractured wrist,

contradicted by contemporaneously created medical records and

plaintiff's own inconsistent statements regarding his injury, did

not create a genuine dispute). Nurse Crawford stated:

> At no time during my interaction with Blome on
> January 8, 2010, did I reset a dislocated
> shoulder or witness anyone else reset a
> dislocated shoulder. (Ex. 1 at 1). In fact, it
> would be physically impossible to properly set
> a dislocated shoulder if the patient was
> handcuffed. An improperly reset shoulder would
> result in the shoulder drooping and a limited
> range of motion, such that the patient could
> not use their arm in the manner which Blome

> uses his left arm upon being returned to his
> cell in the pos[t]-use-of-force handheld
> video.

Crawford's Declaration at 2. Indeed, the post-use-of-force videotape reflects that Blome did not have a dislocated shoulder as a result of the incident, <u>see</u> Def. Ex. F; he never mentioned any shoulder injury to the nurses who provided his post-use-of-force physical, <u>see</u> <u>id</u>.; and the surveillance videotape does not show any signs of a shoulder injury, <u>see</u> Def. Ex. E.

If this case were to proceed to trial, Blome would have only his own testimony to support his version of the events.[17] And, even some of Blome's own evidence contradicts his version of events. Moreover, his testimony is contradicted in relevant and important respects by the video evidence, which is consistent with the declarations of Defendant Gentile, Officer Schmidt, and Nurse Crawford. Moreover, the contemporaneously created medical records, that were generated by individuals who are not Defendants in this action, reflect that Blome had no detectable physical injuries after the alleged use of force.[18] The fixed wing surveillance and

_____

[17] In his post-use-of-force witness statement, taken on the same day as the incident, Blome asserted that "confinement inmates watching can prove" that Blome did not try to "head butt" the escort officer. Def. Ex. D2, dated January 8, 2010, at 2. However, Blome never offered any affidavits from other inmates who allegedly saw the incident.

[18] Nurse Crawford averred: "At no time was I instructed by anyone to falsify or omit any information in my record of Blome's examination." Crawford's Declaration at 2.

the post-use-of-force medical examination videotapes are significantly persuasive evidence that Gentile's use of force was minimal and was applied in a good-faith effort to maintain or restore discipline. Thus, this Court concludes that no reasonable jury could find in favor of the Plaintiff if this case proceeded to trial. See Vicks v. Knight, 380 F.App'x 847, 852 (2010) (per curiam) (finding that, in a case where the records did not reflect that the inmate plaintiff suffered any injury, "a reasonable factfinder could not believe that [the plaintiff] suffered any injury, and thus could not reasonably infer that [the defendant] used anything more than a de minimis amount of force against [the plaintiff]"). As such, after examination of the Whitley factors and the record as a whole, the Court finds that Defendant Gentile's Motion for Summary Judgment is due to be granted and judgment entered in his favor.

Therefore, it is now

**ORDERED:**

1.    Defendant Gentile's Motion for Summary Judgment (Doc. 51) is **GRANTED.**

2.    The **Clerk** shall enter final judgment in favor of Defendant Gentile and against Plaintiff, and shall close this case.

**DONE AND ORDERED** at Jacksonville, Florida this 15th day of September, 2014.

MARCIA MORALES HOWARD
United States District Judge

sc 9/15
c:
Richard Blome
Counsel of Record